UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| THOSE CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON and LONDON MARKET INSURERS, subscribing to the Policy with the Unique Market Reference B1093C080906,<br><br>Plaintiffs,<br><br>v.<br><br>EUGENE HORTON, LLC, a Washington limited liability corporation; EUGENE HORTON, an individual; and OAMPS SPECIAL RISKS, LTD., a Lloyd's broker,<br><br>Defendants. | AT LAW AND IN ADMIRALTY<br><br>NO.<br><br>COMPLAINT<br><br>JURY DEMAND |

COMES NOW Plaintiffs Those Certain Underwriters at Lloyd's of London and London Market Insurers, subscribing to the policy with the Unique Market Reference B1093C080906 ("Underwriters"), and alleges as follows:

COMPLAINT AND JURY DEMAND - 1

LAW OFFICES OF
**MILLS MEYERS SWARTLING**
1000 SECOND AVENUE, 30TH FLOOR
SEATTLE, WASHINGTON 98104-1064
TELEPHONE (206) 382-1000
FACSIMILE (206) 386-7343

## I. NATURE OF CASE

1. This is an action for damages arising from the negligent misrepresentations made by two insurance brokers when procuring a maritime yacht insurance policy from Underwriters to insure a luxury yacht under construction in Washington. Specifically, the brokers made multiple material misrepresentations about the yacht, including with respect to the ownership, intended uses, moorage, and the extent of completion of the yacht. But for these material misrepresentations, Underwriters would not have agreed to insure the yacht and, thus, would not have incurred substantial losses in connection with the yacht policy.

## II. JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1333 and 28 U.S.C. § 1332 because there is diversity of citizenship between plaintiffs and defendants, and the matter in controversy exceeds $75,000, exclusive of interest and costs.

3. Venue is proper under 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## III. PARTIES

4. Plaintiffs Underwriters are foreign entities with their principal places of business in London, England. Underwriters consist of four Lloyd's of London syndicates, including the Travelers Syndicate, and an insurance company, the Royal Sun Alliance Insurance Co.

5. Defendant Eugene Horton, LLC, is a Washington limited liability corporation.

6. Eugene Horton is a Washington resident and insurance broker.

COMPLAINT AND JURY DEMAND - 2

LAW OFFICES OF
**MILLS MEYERS SWARTLING**
1000 SECOND AVENUE, 30TH FLOOR
SEATTLE, WASHINGTON 98104-1064
TELEPHONE (206) 382-1000
FACSIMILE (206) 386-7343

7. OAMPS Special Risks, Ltd. is a foreign entity and a registered Lloyd's broker.

## IV.  FACTUAL BACKGROUND

8. The present dispute arises from a maritime yacht insurance policy procured by Horton and OAMPS on behalf of Stephen Yadvish and Northcoast Yachts, Inc. with respect to a luxury yacht under construction from 2006 to 2010.

### Lloyd's Insurance Market

9. The modern Lloyd's insurance market in London, England, is steeped in specialized traditions dating back to the 17th century. Based on long history and due to the practical realities of insuring risks worldwide, the Lloyd's insurance market is premised on the essential principle that brokers will exercise utmost good faith when presenting risks to Underwriters. Utmost good faith requires the broker to accurately identify all material facts and exposures.

10. When a yacht owner seeks to obtain insurance from a Lloyd's underwriter, the owner must use a London insurance broker specially registered to place insurance within the Lloyd's insurance market.

11. One of the key reasons that brokers must be specially registered is the critical need for brokers presenting potential insurance risks to Lloyd's underwriters to provide accurate and complete information. The information about a potential insurance risk provided by a London broker affects the underwriter's decision whether to insure the yacht in the first instance, as well as the insurance premium and other terms. Without accurate and complete

COMPLAINT AND JURY DEMAND - 3

LAW OFFICES OF
**MILLS MEYERS SWARTLING**
1000 SECOND AVENUE, 30TH FLOOR
SEATTLE, WASHINGTON  98104-1064
TELEPHONE (206) 382-1000
FACSIMILE (206) 386-7343

information about the insurance risk, the underwriter cannot assess the actual risks associated with insuring a particular yacht.

### Construction of the "Northcoast 125" Yacht

12. Stephen Yadvish is the longtime owner of a boat repair business on Lake Union in Seattle, Washington.

13. In 2003, Yadvish took over operation of Northcoast Yachts, Inc. ("Northcoast"), a Tacoma construction yard that manufactures large custom yachts.

14. In 2006, Northcoast began constructing a 125-foot luxury motor-yacht referred to as the "Northcoast 125."

15. Construction of the Northcoast 125 lasted for more than three years until it was finally completed and launched in March 2010.

### Procurement of the Yacht Policy

16. Eugene Horton is an insurance broker operating out of Eugene Horton, LLC (collectively, "Horton") with substantial experience in the maritime insurance industry.

17. For many years, Yadvish used Horton as his insurance broker to place insurance both for Northcoast and for his other businesses.

18. Prior to January 2009, Northcoast insured the Northcoast 125 construction project under two separate insurance policies: (1) a builder's risk policy that covered damage to the project during the course of construction, and (2) a worker's compensation policy covering Northcoast's liabilities to injured workers under the Longshore and Harbor Workers' Compensation Act ("LHWCA").

COMPLAINT AND JURY DEMAND - 4

LAW OFFICES OF
**MILLS MEYERS SWARTLING**
1000 SECOND AVENUE, 30TH FLOOR
SEATTLE, WASHINGTON 98104-1064
TELEPHONE (206) 382-1000
FACSIMILE (206) 386-7343

19. In January 2009, the Northcoast 125 was approximately 60% complete, and Yadvish was under substantial financial pressure. Horton suggested that Northcoast's insurance premiums could be reduced by purchasing a yacht policy in place of the builder's risk and LHWCA policies.

20. Yacht policies are designed to cover already completed yachts. Although they typically contain clauses insuring yacht owners for LHWCA liabilities, this coverage is intended to provide incidental coverage in case the yacht's crew is injured while the yacht is in the shipyard for routine maintenance.

21. In January 2009, Horton emailed Lee Ranson, a registered Lloyd's broker at OAMPS Special Risks, Ltd. ("OAMPS"). Horton asked Ranson to approach Lloyd's underwriters about the possibility of obtaining a yacht policy for the Northcoast 125. The email included a completed "Mega Yacht Insurance Application" form.

22. Horton's email and the accompanying application represented, among other things, that the Northcoast 125 was 85% complete; that the yacht was owned by Steven Yadvish personally; that Yadvish planned to moor his yacht in Lake Union and use it primarily as his personal yacht; and that the yacht had three full-time crew members. Each of these representations was false.

23. After receiving the email and application, Ranson approached John Higham, a Lloyd's underwriter, and proposed that Higham insure the Northcoast 125 pursuant to the terms of a yacht insurance program developed by OAMPS. Ranson made this proposal despite knowing that the OAMPS yacht program was designed to insure completed yachts

COMPLAINT AND JURY DEMAND - 5

LAW OFFICES OF
**MILLS MEYERS SWARTLING**
1000 SECOND AVENUE, 30TH FLOOR
SEATTLE, WASHINGTON 98104-1064
TELEPHONE (206) 382-1000
FACSIMILE (206) 386-7343

only, and that Higham had no underwriting authority to insure construction projects such as the Northcoast 125. On information and belief, Ranson failed to disclose that the Northcoast 125 was not a complete yacht but instead was a yacht under construction that likely would not be completed for some time. On information and belief, Ranson also included some or all of the misrepresentations from Horton's email in his presentation to Higham.

24. Higham relied on the accuracy and completeness of the representations made by Horton and OAMPS, which suggested that the Northcoast 125 was a favorable insurance risk and was an appropriate risk for a yacht policy. He therefore provided a premium quote for the Northcoast 125, which Northcoast and its brokers promptly accepted with a few negotiated modifications.

**Material Misrepresentations and Non-Disclosures**

25. The information provided by Horton and OAMPS to Underwriters contained multiple material misrepresentations and omitted material facts. But for these misrepresentations and omissions, Underwriters would not have agreed to insure the Northcoast 125 under the yacht policy.

26. First, Horton and OAMPS misrepresented that Yadvish owned the Northcoast 125, when in fact Northcoast owned the yacht.

27. Second, Horton and OAMPS misrepresented that the Northcoast 125 would be moored at Lake Union, when in fact the yacht remained un-launched in a shipyard in Tacoma during the entire policy period.

COMPLAINT AND JURY DEMAND - 6

LAW OFFICES OF
**MILLS MEYERS SWARTLING**
1000 SECOND AVENUE, 30TH FLOOR
SEATTLE, WASHINGTON 98104-1064
TELEPHONE (206) 382-1000
FACSIMILE (206) 386-7343

28.     Third, Horton and OAMPS misrepresented that Yadvish intended to use the Northcoast 125 as his personal yacht. Yadvish has confirmed that he never used and never intended to use the Northcoast 125 as his personal yacht.

29.     Fourth, Horton and OAMPS misrepresented that the Northcoast 125 was 85% complete in January 2009. Monthly inspection reports during this period document that the yacht was barely 60% complete in January 2009. After months' worth of work by up to 30 workers, the yacht still required substantial finish work as of October 2009 and was not launched until March 2010 and not documented with the Coast Guard until August 31, 2010.

30.     Finally, Horton and OAMPS failed to disclose that the LHWCA exposure they were asking Underwriters to insure was for up to 30 shipyard workers doing dangerous work on the Northcoast 125 construction project such as welding and heavy construction, rather than the much smaller incidental LHCWA exposure for three yacht crew members when the yacht was in the shipyard for periodic maintenance.

31.     Underwriters reasonably relied on the false and/or misleading information provided by Horton and OAMPS. If the Underwriters involved here had been provided with accurate and complete information regarding the yacht, they would not have agreed to insure the Northcoast 125 under the OAMPS yacht policy form. Other underwriters may have agreed to insure the Northcoast 125 project during this period, but they would have charged a substantially higher premium. Instead, Horton and OAMPS would have been required to place the insurance through separate builder's risk and LHWCA policies at a substantially higher premium.

COMPLAINT AND JURY DEMAND - 7

LAW OFFICES OF
**MILLS MEYERS SWARTLING**
1000 SECOND AVENUE, 30TH FLOOR
SEATTLE, WASHINGTON 98104-1064
TELEPHONE (206) 382-1000
FACSIMILE (206) 386-7343

**LHWCA Claims and State Court Proceedings**

32.  Several shipyard workers engaged in constructing the Northcoast 125 were injured or claimed to have suffered injuries on the job while Underwriters' yacht policy was in effect.  One of those workers was Christopher Moore, a welder who claimed to have injured his back on May 11, 2009 while working on construction of the Northcoast 125.

33.  On approximately February 4, 2010, OAMPS notified Underwriters that Northcoast did not intend to seek coverage from Underwriters for any of the injured workers, including Christopher Moore.  On April 20, 2010, Northcoast and Yadvish brought suit against Horton and OAMPS in Pierce County Superior Court for professional negligence and violation of Washington's consumer protection act, contending that they had "negligently failed to procure appropriate insurance coverages for the known risks attendant to the vessel and construction work on the vessel" and had "failed to procure a builder's risk policy applicable to the vessel and [Northcoast's] employees and, instead, procured a vessel policy which provided markedly less coverage and excluded known risks that had theretofore been covered and which were expected to be covered by [Northcoast.]"

34.  On approximately May 6, 2010, Christopher Moore filed a formal LHWCA claim against Northcoast.  On May 7, 2010, Northcoast tendered the Christopher Moore claim to the brokers and to Underwriters for defense and indemnity.  Horton forwarded the tender to OAMPS, but OAMPS negligently failed to notify Underwriters of the tender.

COMPLAINT AND JURY DEMAND - 8

LAW OFFICES OF
**MILLS MEYERS SWARTLING**
1000 SECOND AVENUE, 30TH FLOOR
SEATTLE, WASHINGTON 98104-1064
TELEPHONE (206) 382-1000
FACSIMILE (206) 386-7343

35. After Underwriters failed to respond to the attempted tender because they had not received it, Yadvish and Northcoast on October 19, 2010 amended their complaint to add Underwriters as defendants and to assert coverage and bad faith claims against Underwriters.

36. On January 12, 2011, Horton filed a motion for summary judgment asking the Pierce County court to rule that Underwriters' yacht policy covered the Christopher Moore claim. On June 3, 2011, the state court trial judge granted Horton's motion without explanation or comment. Subsequently, the judge also awarded Northcoast and Yadvish approximately $64,431.00 in *Olympic Steamship* fees.

37. On approximately August 5, 2011, Underwriters settled with Northcoast and Yadvish by agreeing to pay the negotiated reasonable settlement value of the Christopher Moore claim ($177,000), plus the negotiated reasonable settlement value of the fees awarded to Northcoast and Yadvish ($62,190.62), plus certain reasonable unpaid fees and costs incurred by Northcoast's LHWCA defense attorney (34,506.65). These amounts have all either already been paid, or will be paid on or before December 14, 2011. In return, Horton and Yadvish agreed to nonsuit their claims against Horton and OAMPS without prejudice "to facilitate Underwriters' pursuit of claims against Horton and OAMPS in a forum of its choice." Northcoast and Yadvish also assigned their claims against Horton and OAMPS to Underwriters. A copy of the settlement agreement is attached hereto as Exhibit A.

38. Underwriters also incurred in excess of $135,000 defending themselves against the claims brought in the state court suit.

COMPLAINT AND JURY DEMAND - 9

LAW OFFICES OF
**MILLS MEYERS SWARTLING**
1000 SECOND AVENUE, 30TH FLOOR
SEATTLE, WASHINGTON 98104-1064
TELEPHONE (206) 382-1000
FACSIMILE (206) 386-7343

## V. CAUSES OF ACTION

**Misrepresentation and Violation of Duty of Utmost Good Faith: Horton and OAMPS**

39. Underwriters incorporate paragraphs 1-38 as if fully set forth herein.

40. When requesting yacht insurance from Underwriters for the Northcoast 125, Horton and OAMPS had a duty to Underwriters to act in utmost good faith and to provide full accurate disclosure of all material information regarding the risk sought to be insured. Horton and OAMPS also had a duty to Underwriters to conduct a reasonable investigation into the circumstances before presenting the proposed insurance to Underwriters.

41. Horton and OAMPS violated this duty in multiple respects when submitting insurance information to Underwriters and when soliciting Underwriters' agreement to insure the Northcoast 125 under a yacht policy.

42. The conduct of Horton and OAMPS as described above proximately caused Underwriters to incur damages in excess of $391,197.27 plus interest and fees.

**Negligence: OAMPS**

43. Underwriters incorporate paragraphs 1-42 as if fully set forth herein.

44. OAMPS had a duty to Underwriters to promptly notify Underwriters of any claims or potential claims or requests for defense or indemnity.

45. OAMPS negligently failed to notify Underwriters of the Christopher Moore claim notice generated by Northcoast's attorney and transmitted to OAMPS by Horton on May 7, 2010.

COMPLAINT AND JURY DEMAND - 10

LAW OFFICES OF
**MILLS MEYERS SWARTLING**
1000 SECOND AVENUE, 30TH FLOOR
SEATTLE, WASHINGTON 98104-1064
TELEPHONE (206) 382-1000
FACSIMILE (206) 386-7343

46. The conduct of OAMPS as described above proximately caused Underwriters to incur damages in excess of $391,197.27 plus interest and fees.

## VI. DEMAND FOR JURY TRIAL

47. Pursuant to Federal Rule of Civil Procedure 38, plaintiff demands that all issues herein be tried by a jury.

## VII. RELIEF REQUESTED

Underwriters pray for relief as follows:

A. An award of damages and expenses in an amount to be proven at trial in excess of $391,197.27;

B. An award of reasonable attorneys' fees and costs as allowed by law;

C. Prejudgment interest as allowed by law; and

D. Any other and further relief the Court deems just and equitable.

DATED: December 16, 2011.

MILLS MEYERS SWARTLING
Attorneys for Those Certain Underwriters at Lloyd's of London and London Market Insurers, subscribing to the Policy with the Unique Market Reference B1093C08906

By: /s/ David M. Schoeggl
By: /s/ David W. Howenstine
David M. Schoeggl, WSBA No. 13638
David W. Howenstine, WSBA No. 41216
Mills Meyers Swartling
1000 Second Avenue, 30th Floor
Seattle, WA 98104
Tel: 206-382-1000
Fax: 206-386-7343
E-mail: dschoeggl@millsmeyers.com
         dhowenstine@millsmeyers.com

COMPLAINT AND JURY DEMAND - 11

LAW OFFICES OF
MILLS MEYERS SWARTLING
1000 SECOND AVENUE, 30TH FLOOR
SEATTLE, WASHINGTON 98104-1064
TELEPHONE (206) 382-1000
FACSIMILE (206) 386-7343

## CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE

This Confidential Settlement Agreement and Release (hereinafter the "Agreement") is made this ____ day of August 2011, by and between Northcoast, Underwriters, and Sea-Mountain, all as hereafter defined (the aforementioned parties being referred to hereinafter collectively as the "Parties").

### DECLARATIONS:

1.   Underwriters subscribed, each for his own part and not one for another, to the Policy as hereafter defined covering a yacht known as the "Northcoast 125." Eugene Horton acted as the Seattle broker for the Policy, and OAMPS Special Risks, Ltd. acted as the London broker for the Policy. At all times Sea-Mountain has maintained that it provided only back office support for Horton pursuant to an operating agreement and that Sea-Mountain is a separate legal entity from Horton. Horton is the only individual who advised Northcoast on the selection of the Policy, and Underwriters relied on representations by Horton and OAMPS, but not Sea-Mountain, in deciding whether to subscribe to the Policy.

2.   On approximately May 11, 2009, a Northcoast employee, Christopher A. Moore, suffered an alleged on-the-job injury while working on the construction of the Northcoast 125. Northcoast tendered the claim to Underwriters pursuant to Section V of the Policy. Underwriters questioned coverage based on alleged misrepresentations and nondisclosures made by the brokers prior to placement. Other Northcoast employees also suffered on-the-job injuries during the period of the Policy.

3.   On April 20, 2010, Northcoast sued Sea-Mountain and Eugene Horton, LLC (as well as Eugene Horton and Jane Doe Horton individually) in the Lawsuit alleging that these brokers were liable for the Moore claim and the other claims. Subsequently, Northcoast amended its complaint in the Lawsuit to include claims against Underwriters and against another broker, OAMPS Special Risks, Ltd.

4.   Northcoast and Underwriters believe that brokers Horton and OAMPS have potential liability to Northcoast. Northcoast and Underwriters have attempted to negotiate a settlement involving all parties. Sea-Mountain has cooperated and has agreed to participate in the settlement, but Horton and OAMPS have not.

5.   By this Agreement, the Parties intend to adopt, by way of compromise, without prejudice to or waiver of their respective positions in other matters, without further trial or adjudication of any issues of fact or law between them, and without Underwriters'



admission of liability or responsibility under the Policy, a full and final settlement between them, but the parties also intend to preserve the rights of Underwriters to recover from Horton and/or OAMPS for some or all of the payments made by Underwriters pursuant to this Agreement.

## AGREEMENTS:

NOW, THEREFORE, in full consideration of the foregoing and of the mutual agreements herein contained, and intending to be legally bound, the Parties agree as follows:

1. DEFINITIONS

The following definitions will apply to the listed terms wherever those terms appear throughout the Agreement as well as in any exhibits or attachments thereto. Where the listed terms are also further defined elsewhere in the body of the Agreement, the definitions listed here nonetheless apply and shall serve to further explain the meaning of those terms. Moreover, each defined term stated in a singular form shall include the plural form, each defined term stated in plural form shall include the singular form, and each defined term stated in the masculine form or in the feminine form shall include the other.

### A. Lawsuit

"Lawsuit" shall mean *Northcoast Yachts, Inc. and Stephen Yadvish v. Sea-Mountain Insurance Brokers, Inc., et. al.*, Pierce County Superior Court Cause No. 10-2-08513-6.

### B. Northcoast

"Northcoast" shall mean Steven Yadvish, Northcoast Yachts, Inc., Yachtfish Marine, Inc., and each of their past, present, and future owners, employees, agents, representatives, attorneys, beneficiaries, grantees, transferees, and assigns, and any Person allegedly insured under the Policy, including, but not limited to, any named insured, person insured, additional insured, or additional named insured.

### C. Person

"Person" shall mean an individual, a corporation, a partnership, an association, a trust, any other entity or organization, and any federal, state or local governmental or quasi-

governmental body or political subdivision or any agency, department, board or instrumentality thereof.

### D. Policy

"Policy" shall mean the marine Hull & Machinery policy issued to Stephen Yadvish, covering a yacht known as the Northcoast 125, and bearing the unique market reference BI093C080906, as reflected in OAMPS Cover Note No. C091718 (hereafter "the Policy").

### E. Sea-Mountain

"Sea-Mountain" shall mean Sea-Mountain Insurance Brokers, Inc., and each of its past, present, and future owners, employees, agents, representatives, attorneys, beneficiaries, grantees, transferees, and assigns.

### F. Underwriters

"Underwriters" shall mean Those Certain Underwriters at Lloyd's of London and London Market Insurers, subscribing to the policy with the unique market reference B1093C080906, and all of their past, present and future predecessors, successors, parent corporations, owners, subsidiaries, divisions, affiliates, associations, officers, directors, employees, agents, representatives, partners, attorneys, beneficiaries, grantees, transferees, and assigns and any and all persons acting under their direction or control or on its behalf, but only in their capacity as actual or alleged insurers of Northcoast.

2. PAYMENTS AND COMMITMENTS BY UNDERWRITERS AND SEA-MOUNTAIN

    A. Underwriters shall pay to Northcoast the sum of $62,190.62. Payment shall be made within 90 days of the date of this Agreement, with payment details to be arranged between the parties.

    B. Underwriters shall, on behalf of Northcoast, be responsible for all of Northcoast's indemnity, medical expenses, claimant's attorneys' fees, unpaid defense fees and costs and all other obligations arising under the United States Longshoremen's and Harbor Workers' Compensation Act as the result of an on-the-job injury allegedly sustained by Christopher Moore on or about May 11, 2009.

    C. Sea-Mountain, shall contribute the sum of $7,500.00 towards the settlement payments made by Underwriters to Northcoast. Payment shall be made

within 90 days of the date of this Agreement, with payment details to be arranged between the parties.

3. DISMISSAL OF LAWSUIT

As part of this Agreement, Northcoast has filed a pleading in the Lawsuit that:

A. Dismisses all claims against Underwriters and Sea-Mountain with prejudice and without costs; and

B. Dismisses all claims against Horton and OAMPS without prejudice and without costs pursuant to CR 41(a)(1)(B). The purpose of this dismissal is to facilitate Underwriters' pursuit of claims against Horton and OAMPS in a forum of its choice.

4. MUTUAL RELEASE OF CLAIMS

Northcoast, Underwriters, and Sea-Mountain hereby remise, release, covenant not to sue and forever discharge the following: (a) each of the Parties hereto, (b) each of the Parties' present and former officers, directors, employees, partners, limited partners, shareholders, members, subsidiaries, affiliates, representatives, attorneys and agents in such capacity and in their individual capacity and, (c) the respective heirs, executors, administrators, successors, assigns and reinsurers (in their capacity as reinsurers) of the Parties; from all manner of action, causes of action, suits, debts, accounts, promises, warranties, damages (consequential or punitive), agreements, costs, expenses, claims or demands whatsoever, in law or in equity, whether presently known or unknown, asserted or unasserted, whether sounding in tort or contract, or arising under the statutes or administrative regulations of any jurisdiction, with respect to, arising from or related to the Christopher Moore claim and any other claim for which Northcoast provided notice to Underwriters prior to the date of this Agreement, including claims for defense or indemnity under the Policy, and claims arising out of Underwriters' or Sea Mountain's handling of Northcoast's insurance submission. .

5. ASSIGNMENT OF RIGHTS

A. Northcoast hereby assigns to Underwriters any claims it has or may have against Eugene Horton, Eugene Horton LLC, and OAMPS Special Risks Ltd. arising out of or relating in any way to Northcoast's LHWCA liabilities in respect of the Northcoast 125 or Policy for such liabilities, including claims sounding in tort, contract, law, equity, or based on statutes or common law.

B.  Northcoast shall provide reasonable assistance and cooperation to Underwriters in its pursuit of the claims described in this Paragraph, including but not limited to providing necessary documents and making fact witnesses available for depositions or trial testimony.

6. **FUTURE CLAIMS**

A.  Within 5 days of the date of this Agreement, Northcoast shall provide Underwriters with a letter signed by Yadvish and by Northcoast's president warranting that after reasonable inquiry, they are not aware of any actual or potential LHWCA claims not already reported to Underwriters and thereby released by this Agreement.

B.  If, after the date of this Agreement, a LHWCA claim is first made against Northcoast that is potentially covered by the Policy and that was not identified and could not have been identified in the letter described in paragraph 6(A), then such claim shall not be deemed released by this Agreement.

C.  In the event Northcoast makes a future claim and/or files a future lawsuit pursuant to Paragraph 6(B) hereto, the parties agree that the rulings in the Lawsuit shall have no precedential effect, shall not be admissible, and shall not be binding on either party in such future claim or lawsuit.

7. **NO ADMISSION**

Neither the existence of this Agreement, nor its content, is an admission by either Northcoast or Underwriters regarding the merits of Northcoast's claim under the Policy.

8. **NON-PREJUDICE AND CONSTRUCTION OF AGREEMENT**

A.  This Agreement is intended to be and is a compromise between the Parties and shall not be construed as an admission of coverage under the Policy nor shall this Agreement or any provision hereof be construed as a waiver, modification or retraction of the positions of the Parties with respect to the interpretation and application of the Policy.

B.  This Agreement is the product of informed negotiations and involves compromises of the Parties' previously stated legal positions. Accordingly, this Agreement does not reflect upon the Parties' views as to rights and obligations with respect to matters or persons outside the scope of this Agreement. This Agreement is

without prejudice with regard to positions taken by Underwriters with regard to their other insureds, and without prejudice with regard to positions taken by Northcoast with regard to other insurers. Except as expressly stated herein, the Parties specifically disavow any intention to create rights in third parties under or in relation to this Agreement.

C. This Agreement is the jointly drafted product of arms-length negotiations between the Parties with the benefit of advice from counsel, and the Parties agree that it shall be so construed. As such, neither party will claim any ambiguity in this agreement shall be construed against the other party.

9. NO MODIFICATION

No change or modification of this Agreement shall be valid unless it is made in writing and signed by the Parties.

10. EXECUTION

This Agreement may be executed in counterparts.

11. INTEGRATION

This Agreement, including the attachments, constitutes the entire Agreement between Underwriters, Northcoast, and Sea-Mountain with respect to the subject matter hereof, and supersedes all discussions, agreements and understandings, both written and oral, among the Parties with respect thereto.

YAD002 0001 mh25cg61s6 2011-08-25

17

IN WITNESS WHEREOF, the Parties have executed this Agreement by their duly authorized representatives.

SEA-MOUNTAIN INSURANCE BROKERS, INC.

*[signature]*

Stephen Yadvish, Personally and as President of Northcoast Yachts, Inc. and Yachtfish Marine, Inc.

By *[signature]*

Daren M Hopper (print name)

Its Co-President

**UNDERWRITERS**

[THOSE CERTAIN UNDERWRITERS AT LLOYD'S LONDON, AND LONDON MARKET INSURERS SUBSCRIBING TO THE POLICY WITH THE UNIQUE MARKET REFERENCE B1093C080906]

By *[signature]*

David M. Schoeggl (print name)

Its Attorney in fact